1  KEITH R. VERGES
   PARKER D. YOUNG
2  RAYMOND E. WALKER
   FIGARI & DAVENPORT, L.L.P.
3  901 MAIN STREET, SUITE 3400
   DALLAS, TEXAS 75202
4  TEL: (214) 939-2000
   FAX: (214) 939-2090
5  *ADMITTED PRO HAC VICE*

6
   SHAWN T. LEUTHOLD
7  LAW OFFICE OF SHAWN T. LEUTHOLD
   1671 THE ALAMEDA #303
8  SAN JOSE, CALIFORNIA 95126
   TELEPHONE: (408) 924-0132
9  FACSIMILE: (408) 924-0134

10 Attorneys for Plaintiffs Brice Yingling
   d/b/a Alamo Autosports and Andy Scott
11

12              IN THE UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                      SAN JOSE DIVISION

15 BRICE YINGLING D/B/A            )  Case No. C 09-01733-JW (PVT)
   ALAMO AUTOSPORTS               )
16 AND ANDY SCOTT,                )
                                  )  **RESPONSE TO OBJECTIONS**
17         Plaintiffs,            )  **TO PROPOSED SETTLEMENT**
                                  )
18 V.                             )
                                  )
19                                )
                                  )
20                                )  Date:   March 28, 2011
   EBAY INC.,                     )  Time:   9:00 a.m.
21                                )  Judge:  Honorable James Ware
             DEFENDANT.           )
22 _____)

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.      Introduction...................................................................................................................... 1

II.     Argument and Authorities................................................................................................ 2

        A.      The Objections Do Not Provide Any Meaningful Insight or Assistance
                to the Court in Evaluating the Settlement or Fee Application. .................................. 2

        B.      This Court Should Apply the Percentage of the Common Fund Method
                to Calculate Fees.................................................................................................... 3

        C.      There Is No Suggestion That "Special Circumstances" Exist to
                Warrant a Downward Adjustment from the 25% Benchmark. .................................. 5

        D.      The Settlement Fund Compares Favorably to the Potential Damages
                and is Far From *De Minimus.* ................................................................................ 6

        E.      The Case Was Neither Short Nor Easy. .................................................................. 7

        F.      Establishing eBay's Liability Was Always at Risk.................................................... 9

        G.      The Lodestar Multiplier Sought by Class Counsel is Reasonable
                and Imposing a Lower Multiplier Would Only Motivate Class
                Counsel in Other Suits To Accept Inadequate Settlement Amounts......................... 10

        H.      Balla and His Counsel Are Simply Serial Objectors. ............................................. 12

                1.      Palmer's History of Objecting Entirely For Personal,
                        Not Class, Gain.......................................................................................... 13

                2.      Palmer's Tactics are Disfavored. ............................................................... 14

III.    Conclusion...................................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Devlin v. Scardaletti,*
   536 U.S. 1 (2001)..........................................................................................................15

*Florida v. Dunne,*
   915 F.2d 542 (9th Cir. 1990) ..........................................................................................4

*Gemelas v. Dannon Co.,*
   No. 1:08CV236, 2010 U.S. Dist. LEXIS 99503
   (N.D. Ohio August 31, 2010) ........................................................................................15

*In re Countrywide Fin. Corp. Customer Data Security Breach Litig.,*
   No. 3:08-MD-01998, MDL No. 1998 ...........................................................................13

*In re Delphi Corp. Secs. Litig.,*
   248 F.R.D. 483 (E.D. Mich. 2008) ................................................................................14

*In re Initial Public Offering Secs. Litig.,*
   721 F.Supp.2d 210 (S.D. N.Y. 2010) ...........................................................................15

*In re Lease Oil Antitrust Litig.,*
   186 F.R.D. 403 (S.D. Tex. 1999)....................................................................................8

*In re Microstrategy, Inc. Sec. Litig.,*
   172 F.Supp.2d 778 (E.D. Va. 2001) ...............................................................................4

*In re Pacific Enters. Sec. Litig.,*
   47 F.3d 373 (9th Cir. 1995) ............................................................................................8

*In re Rite Aid Corp. Sec. Litig.,*
   146 F. Supp. 2d 706 (E.D. Pa. 2001)..............................................................................8

*In re UnitedHealth Group PSLRA Litig.,*
   643 F.Supp.2d 1107 (D. Minn. 2009)...........................................................................15

*In re Ventro Corp. Secs. Litig.,*
   226 F. Appx. 711 (9th Cir. 2007) ...................................................................................5

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,*
   19 F.3d 1291 (9th Cir. 1994) ..........................................................................................3

*La. Mun. Police Ret. Sys v. Sealed Air Corp.*
   No. 03-CV-4372, 2009 U.S. Dist. LEXIS 112989 (D.N.J. Dec. 4, 2009)......................7

*Paul, Johnson, Alston & Hunt v. Graulty,*
   886 F.2d 268 (9th Cir. 1989) .....................................................................................3, 4

*Rodriguez v. West Publishing Corp.,*
   2:05-cv-03222, Doc. 614 (C.D. Cal, Feb. 1, 2010).......................................................14

*Six Mexican Workers v. Arizona Citrus Growers,*
  904 F.2d 1311 (9th Cir. 1990) ................................................................................. 5

*Torrisi v. Tucson Elec. Power Co.,*
  8 F.3d 1370 (9th Cir. 1993) .............................................................................. 5, 8

*Vasquez v. Coast Valley Roofing Inc.,*
  266 F.R.D. 482 (E.D. Cal. 2010) ............................................................................. 5

*Vizcaino v. Microsoft Corp.,*
  290 F.3d 1043 (9th Cir. 2002) ................................................................................. 3

**OTHER AUTHORITIES**

Fed. R. App. P. 7 ...................................................................................................... 15

Geoffrey P. Miller & Lori S. Singer, *Nonpecuniary Class Action Settlements,*
  60 Law & Contemp. Probs. 97 (Autumn 1997) ..................................................... 15

Alba Conte & Herbert B. Newberg , *5 Newberg On Class Actions*
  § 15.37 (4th Ed. 2002) ........................................................................................ 15

Simmons, *Securities Lawsuits: Settlement Statistics for Post-Reform Act Cases* ............................... 7

Plaintiffs and Class Counsel submit this response to the Objections to the Proposed Settlement ("Objections") and state:

## I. <u>INTRODUCTION</u>

From the over 2.5 million Settlement Class Members, there have been just two objections to the settlement. On or about January 17, 2011, Christopher Graeser mailed to Class Counsel (but did not file) an unsigned *pro se* objection; Class Counsel attached the objection to their Motion for Final Approval ("Graeser Objection;" *see* Doc. 213-4). On February 14, 2011, Joseph Balla ("Balla") filed an objection via his counsel Darrell Palmer ("Palmer") ("Balla Objection") (Doc. 212).

The only aspect of the settlement that either objector addresses is the requested Class Counsel fee. Specifically, Graeser objects that "class members are to receive less than 7% of what they were charged – unlikely to be more than pocket change – and class counsel will receive up to 7.5 million dollars." Doc 213-4 at 1. The objection also asserts that Class Counsel "had little incentive to maximize the settlement fund" and that there was a "wholesale abdication of class counsel's responsibilities to their clients in their quest to maximize their own fees." *Id.* at 2. There is no assertion, however, that eBay's legal liability was actually greater than the recovery provided for in the Settlement Fund, nor is there any legal authority that Class Counsel is not deserving of the benchmark 25% fee espoused by the 9th Circuit.

The Balla Objection is also aimed entirely at Class Counsel's fee. While his attorney, Palmer, does not even attempt to demonstrate that he has any experience or competence in successfully litigating or defending large class actions, he nevertheless asserts that: (1) the common fund approach to calculating fees should not be used; (2) the result was small compared to the Class's losses and Class Counsel's estimate of damages; (3) the case was not difficult; (4) the case was not lengthy; (5) the risk was not appreciable; and (6) the fees are too high based on hours, rates and the lodestar multiplier. Palmer, however, offers no independent facts, evidence, or experience to support any of these assertions.

As shown in detail below, each of the objections is meritless. The Graeser Objection is little more than a generic statement decrying all class actions. And the Balla Objection is similarly lacking in substance and merit. Indeed, Balla's counsel, Palmer, is a serial objector who routinely tries to swoop in at the end of a class action case and take a piece of the attorneys' fees by interfering with the completion of the settlement.[1] Even Balla has become a serial objector, this being at least the second time he has served as Palmer's client for purposes of opposing a class action settlement. Accordingly, the objections should each be denied in their entirety.

## II. ARGUMENT AND AUTHORITIES

### A. The Objections Do Not Provide Any Meaningful Insight or Assistance to the Court in Evaluating the Settlement or Fee Application.

The Balla Objection begins with a statement of well-established law, namely that this Court should carefully scrutinize Class Counsel's fee application. [Doc. 212 at 2.] This axiomatic statement adds nothing that this Court does not already know. The Court is undoubtedly well aware of its obligation to properly evaluate class settlements and fee applications and has done so countless times. The rest of Balla's Objection is similarly unhelpful, consisting of nothing more than (1) a regurgitation of the procedural history in this case and facts regarding the settlement that were fully disclosed and discussed in previously filed pleadings and the settlement notice; and (2) argumentative opinions of Balla's counsel about various subjective issues, such as whether the requested fee is "reasonable" or "excessive" and whether the case was "difficult" or "risky." The Court is fully capable of forming its own opinions about these matters. Objections like Balla's and Graeser's that bring no new facts or evidence to the Court do little, if anything, to assist that process.

---

[1] Knowing that his reputation will precede him, Palmer attempts to preemptively cast the term "serial objector" as an improper "pejorative epithet." (Doc. 212 at 8:22). While there is no denying that the term may engender certain negative connotations amongst the attorneys and judges who actually perform the hard work needed to fairly and responsibly resolve class action disputes, those connotations are typically well-deserved. More importantly, describing Palmer as a "serial objector" is irrefutably, 100% factually accurate. *See* Section "H" below.

As set forth in the Motion for Award of Attorneys' Fees (Doc. 211), "those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994). Neither Objector cites any contrary authority nor do they challenge any other case cited in the Motion for Award of Attorneys' Fees. Rather, both Objectors simply make unfounded, conclusory assertions that this Court should reject.

**B. This Court Should Apply the Percentage of the Common Fund Method to Calculate Fees.**

Balla's Objection correctly points out that the Ninth Circuit gives discretion to the trial court to select either the percentage or lodestar method for calculating attorneys' fees, citing *In re Washington Public Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994) as support for that proposition. [Doc. 212 at 3:16.] Balla's Objection fails to note, however, that the Ninth Circuit in *Washington Public Power* vacated and remanded a 1.2 lodestar multiplier because the trial court failed to consider increasing the award due to the risk associated with the case. The other cases cited in the Balla Objection applied the common fund or percentage method and awarded the "benchmark" 25% or a larger percentage. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049-51 (9th Cir. 2002) (affirming attorneys' fee award of 28% of gross common fund and overruling objections that percentage should have been lower; also denying objectors' request for attorneys' fees); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271-72 (9th Cir. 1989) (trial court abused its discretion by awarding only 19.5% of gross settlement amount).

While Balla conclusorily asserts that the common fund percentage approach should not apply, the authorities he cites actually reflect the importance of awarding a percentage of a common fund:

> The percentage-of-recovery method does not depend on counsel's hourly rates or billable hours; it is, instead, based upon a percentage of the common fund, with the precise percentage selected by the trial court with reference to essentially the same case-specific factors used to adjust, or determine a multiplier for, a lodestar figure. [citation omitted] This method is less cumbersome to apply than the lodestar

1
2
3

computation, and it has the virtue of reducing the incentive for plaintiffs' attorneys to over-litigate or "churn" cases, particularly those cases with a high probability of success. . . . [I]ndeed, in recent years, two circuits have mandated, and seven circuits have explicitly approved, the use of the percentage-of-recovery approach in common fund cases.

4

*In re Microstrategy, Inc. Sec. Litig.*, 172 F.Supp.2d 778, 786-87 (E.D. Va. 2001) (further noting that

5

setting proper fee "must include an incentive component to ensure that competent, experienced

6

counsel will be encouraged to undertake the often risky and arduous task of representing a class");

7

*see also Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990) (noting "recent groundswell support

8

for mandating a percentage-of-the-fund approach in common fund cases").

9
10

The Ninth Circuit's discussion in *Paul, Johnson* is particularly instructive:

11
12
13
14
15
16
17
18
19

We leave to the district court the task of determining what would be reasonable compensation for creating this common fund but we add the following advice. A task force commission by the Third Circuit has recommended that compensation for creating common funds be calculated by a percentage of the funds created. [Citation omitted.] This method stands in contrast to other courts who apply the "lodestar method," which calculates the fee award by multiplying the number of hours reasonably spent by a reasonable hourly rate and then enhancing that figure, if necessary, to account for the risks associated with the representation. [Citation omitted.] We believe that either method may, depending upon the circumstances, have its place in determining what would be reasonable compensation for creating a common fund. [Citation omitted.] Under the circumstances here, however, we believe that the percentage method is better. . . . ***We note with approval that one court has concluded that the "benchmark" percentage for the fee award should be 25%.*** That percentage amount can then be adjusted upward or downward to account for any unusual circumstances involved in this case.

20
21

*Paul, Johnson*, 886 F.2d at 272 (emphasis supplied).

22

Thus, while trial courts certainly possess the discretion to select between the common fund

23

and lodestar method, the cases are clear that the common fund percentage is preferred. The Court

24

should follow the logic and weight of modern authority and evaluate fees under the common fund

approach.

25
26
27
28

**C.    There Is No Suggestion That "Special Circumstances" Exist to Warrant a Downward Adjustment from the 25% Benchmark.**

Balla next contends that if the Court applies the common fund method, then 25% is too much. [Doc 212 at 4-5.] But the Ninth Circuit cases he cites all awarded 25% or more.[2] *Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir. 1990); *In re Ventro Corp. Secs. Litig.,* 226 F. Appx. 711 (9th Cir. 2007); *see also Vasquez v. Coast Valley Roofing Inc.,* 266 F.R.D. 482, 491 (E.D. Cal. 2010) (mis-cited at Doc. 212 p.6 as 9th Cir., but awarding 33% of gross common fund as fee).  Moreover, those same cases repeatedly hold that deviating from the 25% benchmark in common fund cases is appropriate only when unusual circumstances are present.

For example, the court in *Six Mexican Workers* noted that only "special circumstances" justified departing from the 25% benchmark. *Six Mexican Workers*, 904 F.2d at 1311.  Likewise, the most recent Ninth Circuit case upon which Balla relies specifically noted that the 25% benchmark should be adjusted only if there are "special circumstances." *In re Ventro Corp. Secs. Litig.*, 226 F.Appx. at 711 (9th Cir. 2007)(denying an objection to a 25% benchmark fee award because "there were no unusual circumstances requiring an upward or downward adjustment. . . ."); *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (cited in Doc. 212 at p. 6; awarding 25% of gross $30 million fund in fees since "There are no ***special circumstances*** here which indicate that the 25% benchmark award is either too small or too large" (emphasis supplied)).

If anything, the circumstances in this case argue in favor of an *upward* deviation from 25% – something that Class Counsel is not even requesting.  Unlike the trend in many class action cases these days, the settlement in this case is all cash, with no reversion to the defendant, and will be paid to Class Members without a cumbersome claim process.  The case has been litigated against a

---

[2] The case that Balla cites from Virginia that did reduce the fee from 25% involved a significant non-cash or "coupon" component upon which the percentage was to be based. *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 787-88 (E. D. Va. 2001).  That situation is not present here.

1   formidable opponent in an efficient and timely manner, without any "churning," overstaffing, or

2   unreasonable delays.  Balla tries to warp these facts into a basis for reducing Class Counsel's fee,

3   whereas the correct perspective on the case leads to exactly the opposite conclusion.  These are all

4   hallmarks of a case that has been well handled and professionally litigated to achieve an excellent

5   result for the Class, and Class Counsel therefore deserves at least the standard 25% fee for their

6   efforts and risk.  Accordingly, since Balla wholly fails to identify any special or unusual

7   circumstances in this case that would justify reducing Class Counsel's fee, the Court should adhere

8   to the benchmark 25% fee.

9

**D.     The Settlement Fund Compares Favorably to the**
**        Potential Damages and is Far From _De Minimus._**

10

11       Both objectors assert that the payments to Class Members of 6.67% of _total_ Final Value Fees

12  paid are "de minimus" or "pocket change."  [Doc. 212 at 6:12[3]; Graeser Objection at 1.]  But both

13  arguments reflect a fundamental misunderstanding of the case by incorrectly comparing the

14  Settlement Fund with _total_ Final Value Fees paid by the Class rather than with the Class's _potential_

15  _recoverable damages_.  Under any reasonable construction of the eBay User Agreement and other

16

17  website pages, it cannot be realistically argued that _no_ Final Value Fee (or back-end fee) applied to

18  eBay Motors Parts and Accessories listings and that Class Members should have received the

19  benefits of completing a successful eBay sale for free.  Thus, some amount of Final Value Fees were

20  properly charged; the question has always been how much.

21       The fairness and adequacy of the Settlement Fund in comparison to potential overcharges

22  was described at length in the Motion for Final Approval.  [Doc. 213 at 9-11.]  By way of summary,

23  the maximum potential overcharge was approximately $120 million in total; the Settlement fund is

24

25

26  ---
[3] Balla finds himself coming and going in his section C entitled "The Size of the Fund" (Doc. 212 at 7) when he asserts

27  that a 30% settlement recovery out of "damages of more than $100 million" is a small amount, yet at the same time he deems a 25% fee out of a fund that did not even exist until created and preserved by Class Counsel to be excessive.  In

28  any event, Balla offers no evidence or legal argument, just his conclusion that the Settlement Fund is "small."  The Court should reject this unfounded conclusion.

25% of this sum.  Moreover, come time of trial there was a strong chance that the damage model would have been further refined to more like $75 million, making the Settlement Fund 40% of the total potential damages.  Either percentage is over 6 times the average damage recovery in, for example, securities class actions.  *See generally*, Simmons, *Securities Lawsuits: Settlement Statistics for Post-Reform Act Cases,* Cornerstone Research (2004)[4] (median settlement for 495 cases settled prior to year-end 2003 was 4.0% of estimated damages); *see also La. Mun. Police Ret. Sys v. Sealed Air Corp.* No. 03-CV-4372, 2009 U.S. Dist. LEXIS 112989 (D.N.J. Dec. 4, 2009) (citing with approval the Simmons study to evaluate fairness of class action settlement).

In addition, many of the payments to class members can hardly be described as immaterial. While some Class Members only paid a small amount to eBay in Final Value Fees, there are others who paid over a million dollars in Final Value Fees during the Class Period and therefore will recover a significant sum.[5] [Verges Declaration (Exhibit "A") ¶ 3.]  Some of the payments to class members will exceed $100,000.  [*Id.*]  It is particularly telling that neither Objector suggests that a larger Settlement Fund could or should have been obtained.  Suffice it to say that the Settlement Fund is $30 million more than eBay has ever agreed to play a class of its customers.  By any reasonable standard, this is an extraordinary result for the Class and certainly cannot serve as a basis for downgrading the amount of the fee to be awarded to Class Counsel.

**E.   The Case Was Neither Short Nor Easy.**

In the Balla Objection, Balla's counsel cites a handful of pleadings he reviewed and concluded that the case was "neither extraordinarily difficult nor lengthy."  Doc 212 at 3 (he again

---

[4]  This study is available on line at http://www.cornerstone.com/files/Publication/4db95e9a-4efd-4ae4-96ce-9901db01d5a3/Presentation/PublicationAttachment/59023011-d4d3-4238-b085-5d3238964587/Settlements_2004.pdf.

[5]  Notably, none of the Class Members with large settlement payments have objected to Class Counsel receiving 25% of the Settlement Fund.  If the fee is set at 25%, Class Members receiving $75,000 or more will indirectly be paying $25,000 or more to Class Counsel for their services in this case, yet none of those Class Members have expressed any dissatisfaction with their recovery or the proposed fee structure.  In contrast, even if no fees were paid to Class Counsel, Balla's share of the settlement amount would be less than $10.00. [Verges Decl. ¶ 4.]

---

1   argues that the litigation was "not lengthy" at pp. 6-7). The nearly 2 years this case has been

2   pending (and work on the case began several months before it was filed[6]) was hardly brief.

3   More importantly, the fact that this case is reaching a final settlement hearing approximately

4   2 years after its initiation is not unusual and certainly is not a "special circumstance" that suggests

5   the 25% benchmark fee sought by Class Counsel is inappropriate. *See, e.g., In re Pacific Enters.*

6   *Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) (court awarded attorney's fees of $4 million, or 33% of the

7   $12 million settlement amount, in a case that lasted approximately 27 months from filing to

8   settlement); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993) (court awarded

9   attorney's fees of $7.5 million, or 25% of the $30 million settlement amount, in a case that lasted

10  approximately 27 months from filing to settlement); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d

11  706 (E.D. Pa. 2001) (court awarded attorney's fees totaling 25% of the settlement amount in a case

12  that lasted approximately 20 months from filing to settlement); *In re Lease Oil Antitrust Litig.*, 186

13  F.R.D. 403 (S.D. Tex. 1999) (court awarded attorney's fees totaling 25% of the settlement amount

14  in a case that lasted approximately 28 months from filing to settlement).

15  To the extent this case moved quickly in Balla's view, it was due to this Court's pro-active

16  scheduling orders. This Court ran a tight ship from a scheduling perspective and, if anything, the

17  schedule required Class Counsel to devote greater attention to this matter in a short time span than

18  they might have had to devote in other courts with more relaxed scheduling orders. Insofar as the

19  substantive and procedural complexity of the case is concerned, Class Counsel has previously

20  described the work performed, risks confronted, and results obtained in the Motion for Preliminary

21  Approval, Motion for Fees, and Motion for Final Approval. Since the Balla Objection does not

22  challenge or dispute any of that description, this Response will not burden the Court with a

---

[6] Balla asserts that "it is worth noting that six months of time and 5 percent of the total billed hours (181.55 hours) were spent in advance of even filing the Original Complaint on June 21, 2009." [Doc. 212 at 7:10-12] First, the Complaint was filed on April 21, not June 21, 2009, so Balla overstates the length of the pre-filing investigation by 50%. Regardless, what about this is "worth noting?" Class Counsel's diligence in spending a few weeks of attorney time to carefully investigate and evaluate a large class action case before filing it is merely prudent and it certainly is not atypical.

1
2
3

repetition of those matters. In short, Balla's after-the-fact conclusion that this case was quick and easy is over-simplified hindsight by someone who wasn't in the trenches over the past two years and who wasn't funding all of the out-of-pocket expenses on behalf of the Class along the way.

4

**F.    Establishing eBay's Liability Was Always at Risk.**

5
6
7

The Balla Objection implies that (1) liability was essentially a foregone conclusion as of April 21, 2009, the date this case was filed; and (2) the case was low risk. [Doc. 212 at 6.] The premise of these assertions is incorrect.

8
9
10
11
12
13
14
15
16
17
18
19
20

On April 21, 2009, eBay had revised its eBay Motors Fee Page to fix the "Stacking" problem that triggered Class Counsel's investigation in this matter. Therefore, as of that date, the problematic language quoted in the Class Action Complaint was *gone from the eBay web site*. Unless someone like Class Counsel had saved the prior version of eBay's web pages, there was no way to see, let alone complain about, the Stacking verbiage that existed from September 2008-April 2009. Neither Balla nor his counsel suggests that they or any other person had the knowledge necessary to bring these claims on or before April 21, 2009. If this case was so obviously going to be fast and easy, rest assured that other copycat suits would have been filed asserting the same claims on behalf of other putative class representatives, something which is increasingly common in large cases. The fact that Class Counsel has been single-handedly battling eBay for the last two years speaks volumes about how difficult and risky this case actually was.

21
22
23
24
25
26
27
28

As far as the eBay *internal email* with commentary that the eBay Motors Fee Page was "potentially misleading" is concerned, this information was not available on April 21, 2009. To the contrary, eBay's customer service representative told the Class Representative Yingling that the eBay Motors Fee Page was clear and that his complaint was unfounded. eBay's internal email was discovered only after Yingling hired Class Counsel and Class Counsel successfully prosecuted motions to compel. But even then, eBay designated the email as "Confidential." Class Counsel had to object to eBay's designation so that Balla and the public could see the email in the Court's

1   docket. [*e.g.*, Doc. 149.]  Notably, Class Counsel's efforts in that regard benefitted only the Class

2   and the public, since Class Counsel, eBay, and the Court had already seen the memorandum due to

3   their access to the matters filed under seal.

4       Moreover, the email with the "potentially misleading" remark related only to the

5   "Stacking" damages claim, which represented a possible recovery of only approximately $4.2

6   million.  While eBay may have internally acknowledged that the eBay Motors Fee Page used from

7   September 2008-April 2009 was "potentially misleading," Class Counsel unearthed another 3½

8   years of fee pages, none of which were described as "potentially misleading" internally by eBay

9   and all of which eBay would have argued supported its version of the facts in one way or another.

10  The $30 million Settlement Fund only became possible due to the thorough investigation of all

11  versions of eBay Motors Fee Pages and the eBay website in existence for years and pursuit of all

12  overcharge claims predicated on those web pages.  In short, any objective observer would have to

13  concede that this case always had material risk, not only as to liability, but as to the facts and

14  amount of damages.

15

16  **G.    The Lodestar Multiplier Sought by Class Counsel is Reasonable
            and Imposing a Lower Multiplier Would Only Motivate Class
17          Counsel in Other Suits To Accept Inadequate Settlement Amounts.**

18      Balla does not challenge either the hourly rates[7], numbers of hours of attorney work, or total

19  amount of fees in Class Counsel's lodestar calculations.  Nor does he address the numerous cases

20  cited in the Motion for Award of Attorney's Fees where courts have approved lodestar multipliers at

21  least as high the multiplier sought in this case.  [*See* Doc. 211 at 19:13-24.]  Instead, he merely

22  concludes, without analysis, that a 6.46 lodestar multiplier is "rather high," and requests that the

23  Court impose a *zero* multiplier, which if taken literally would result in zero fees. [Doc. 212 at 4:11]

24

25

26  _____

27  [7] In fact, the lodestar analysis uses hourly attorney rates common in Texas, with a range from $230 for associates to
    $425 for senior partners.  As the Court is undoubtedly aware, these rates are dramatically less than the rates typically
    charged by similarly experienced commercial litigators in the Northern District of California.  Using hourly rates that
    are common in this District would easily increase Class Counsel's lodestar calculation by at least 50%, which in turn
28  would reduce the lodestar multiplier to only 4.3 or less. *See* Exh. A *at* ¶ 6.

1   Balla reiterates this argument when he later asserts that the result of awarding the benchmark 25%

2   would amount to an "excessive" hourly rate and that the "multiplier is excessive." [Doc. 212 at

3   7:16; 8:7.] Balla offers no logical or legal basis for his argument – he just wants Class Counsel fees

4   to go down so he can take the credit and support his own counsel's request for fees and his request

5   for an incentive payment. Not only is this argument wrong for the reasons described above and in

6   the Motion for Award of Attorney's fees, if courts adopted his approach it would inevitably result in

7   (1) lawyers refusing to pursue colorable class actions; and (2) lower class recoveries in the suits that

8   actually get filed.

9        One truism of contingency fee class action work is that the winning cases pay for the losers.

10  If attorneys evaluating potential class actions could only expect to obtain a lodestar multiplier of 1

11  or 2 in their most successful cases like this one, only the very best, "slam dunk" cases would ever be

12  filed. At low multipliers, there simply is not enough incentive to offset the risk of taking on large,

13  well funded corporations in protracted litigation unless the ultimate recovery is almost certain.

14  Furthermore, for attorneys who already have ample hourly work, like Class Counsel, there would be

15  no incentive to incur the opportunity costs of foregoing normal hourly work to pursue risky,

16  contingent fee class actions.[8] Under Balla's construct, only underemployed lawyers would be

17  willing to risk their time to pursue a class action that, if successful, would merely pay them their

18  normal hourly fee.

19        Furthermore, as many courts have recognized, the common fund approach and the 25%

20  benchmark align the financial interests of class counsel with the financial interests of their clients.

21  The better the class does financially, the better class counsel does. Although it is unclear where

22  Balla would draw the line on attorneys' fee awards, he argues for what amounts to virtually a *per se*

23  cap on the lodestar multiplier. Balla's proposed reduction from the 25% benchmark not only

---

[8] Class Counsel is a small commercial litigation firm comprised of 26 attorneys. More than 99% of the cases handled by the firm are hourly-based work. [Verges Decl. ¶ 5.] Class Counsel is confident the firm could have worked on hourly-fee-paying cases instead of this case. (*Id.*)

eliminates alignment of financial interests between counsel and the class, but would also motivate some class counsel to either settle cheaply or "churn" a case and pad bills to generate a unnecessarily large lodestar.

For instance, going into the mediation in this case, Class Counsel knew what it had spent on the case in time and expenses; Class Counsel also knew what its risk and damages assessments were. If courts routinely limited lodestar multipliers to 1 or 2 as proposed by Balla, and if Class Counsel was simply motivated by recovering its fees as Balla and Graeser suggest (which is untrue), the mediation could have ended quickly (and might not have even been necessary) with a settlement of $5 million or even $10 million. The latter amount would have resulted in a $2.5 million fee (at 25%) with a very low lodestar multiple and would have almost certainly passed muster as "fair," given the broad range of discretion afforded Class Counsel in assessing risk.

Class Counsel instead held out for $30 million with the full expectation that the Court would not artificially cap their fee recovery just because they managed to obtain a good result for the Class. Thus, and contrary to the Graeser objection, Class Counsel *did* have an incentive to maximize the Settlement Fund and *did not* "abdicate" their responsibility to get as much for the Class as possible. It is only fair that Class Counsel share, at the 25% benchmark level, with the class for its perseverance and aggressive pursuit of as much money as possible in this case. An arbitrary reduction from 25% would not only ignore what Class Counsel achieved, it would send a signal to other lawyers at the helms of class actions to settle as soon as they can get the offer up to a small multiple of their hourly fees, irrespective of the merits or actual damages.

## H.   Balla and His Counsel Are Simply Serial Objectors.

Balla and Palmer try to disguise their effort to extort a share of fees earned by Class Counsel with assertions of the "importance of objectors" and the "great value" they provide to the Class. [Doc. 212 at 8:20-26.] The problem with this generic argument is that, based upon the information

1
2

Class Counsel has thus far been able to obtain, Palmer's and Balla's repeated class action objections have never once added any monetary value to anyone but themselves.

3

**1.    Palmer's History of Objecting Entirely For Personal, Not Class, Gain.**

4
5
6
7
8
9
10
11
12

Palmer asserts that his purpose in objecting is to "provide great value to the class action process." (Doc. 212 at 8:20). But Palmer's history tells a different story. In at least 20 other cases, his typical *modus operandi* has been as follows: (1) file an objection; (2) lose; (3) file a notice of appeal designed to delay distribution of settlement benefits to the class or payment to class counsel until the appeal is resolved; (4) accept a "settlement" to dismiss the appeal; and (5) achieve no monetary benefit for the class. In none of the other Palmer cases located by Class Counsel did any court find that Palmer achieved any monetary benefit to the class, let alone that he was entitled to any attorneys' fees for his objection.

13
14
15
16
17
18
19
20
21
22
23
24
25

Attached as Exhibit "B" is a chart listing the cases that Class Counsel located in which Palmer previously filed objections. Palmer lost or withdrew his objection in every case that has been decided (some objections remain pending). For example, this Court overruled Palmer's objections to the *NVIDIA* settlement a few months ago. *See* Exh. B, Line 7. Nevertheless, Palmer sometimes asks for attorneys' fees from the court, again always losing. For example, the Chief Judge of the Western District of Kentucky recently wrote that Palmer had not "raised any issues that the Court would not have considered otherwise when addressing the fairness, reasonableness, and adequacy of the settlement." Exh. B, Line 15; *In re Countrywide Fin. Corp. Customer Data Security Breach Litig.,* No. 3:08-MD-01998, MDL No. 1998, Doc. 320 (Aug. 24, 2010), attached as Exhibit "C." The *Countrywide* court further commented that "a cottage industry has developed of professional objectors, where ... the emphasis or at least the primary motivation is attorneys' fees." *Id.*

26
27
28

Palmer also enlists his clients to repeatedly object. As Exhibit B shows, not only has Palmer appeared as objecting counsel in at least 21 cases, Balla has objected previously in *Hoffman v.*

*Citibank* and two of Palmer's other clients, the Orloff Family and Smokestack Lightning, have also repeatedly objected. *See* Exh. B, lines 1, 6, 10, 14, 16. If he doesn't have a client, Palmer has even tried to object purportedly *in propria persona.* *Id.* at line 17.

Palmer also recycles prior objections, irrespective of the type of underlying claims in the case. For example, Palmer objected in a securities fraud class action styled *In re Micron Technology. Id.* at line 10. Despite the significant differences between *Micron* and this case, the *Micron* objection is verbatim identical in most respects to the Balla Objection. *See* Exhibit "D." Palmer didn't even change his citations from *Micron*; for example, Palmer cites to the Private Securities Litigation Reform Act that applied in *Micron* but is irrelevant here. *E.g., compare* Exhibit D at pp. 4-6 *with* Balla Objection pp. 4-5.

Most importantly, in none of the cases where Palmer objected did he achieve any monetary benefit to the class that was recognized by a court as meriting the payment of his fees from the settlement fund.[9] Instead, Palmer routinely dismisses his appeals in exchange for payment from class counsel. For example, in *Yeagley v. Wells Fargo & Co.,* Palmer filed an objection only to later file a "Witdrawl (sic) of Objection" in which he "urges the Court to award the full amount to Class Counsel," because "Class Counsel has agreed with [Palmer] to reimburse [objector's] attorney's fees . . . ." Exhibit "E" at 1-2.

## 2.    Palmer's Tactics are Disfavored.

While the occasional objection to a class action settlement may be well-founded and of benefit to the class, the courts uniformly frown upon *serial* objectors to class action settlements. *See In re Delphi Corp. Secs. Litig.,* 248 F.R.D. 483, 500 (E.D. Mich. 2008) (rejecting objection filed

---

[9] Of course, that doesn't mean Palmer has not repeatedly tried to obtain a fee award from the courts in which he files objections. Interestingly, in one recent case where Palmer applied for nearly $500,000 in attorneys' fees, he asked for a percentage of the common fund, not just a lodestar from his hours. *See Rodriguez v. West Publishing Corp.*, 2:05-cv-03222, Doc. 614 (C.D. Cal, Feb. 1, 2010). Like other courts confronted with an unmeritorious objection from Palmer, the trial court in *Rodriguez* denied Palmer's fee application. *Rodriguez,* CV 05-3222, 2010 U.S. Dist. LEXIS 24155, * 16 (C. D. Cal, Feb. 3, 2010). More detail on *Rodriguez* is available at the class settlement web site http://www.barbri-classaction.com/barbri/default.htm.

by "serial objector"). Consequently, courts considering serial objectors have commonly imposed a bond requirement under Federal Rule of Appellate Procedure 7 for any appeal. *See In re Initial Public Offering Secs. Litig.*, 721 F.Supp.2d 210, 214-15 (S.D. N.Y. 2010) (serial objectors required to post bonds had engaged in "bad faith or vexatious conduct," including an effort to "extort an exorbitant fee from Class Counsel in exchange for withdrawing their appeal" and imposing a $25,000.00 bond); *Gemelas v. Dannon Co.*, No. 1:08CV236, 2010 U.S. Dist. LEXIS 99503, *6-8 (N.D. Ohio August 31, 2010) (imposing $25,000.00 appellate cost bond against serial objector).

One United States District Court Judge, the Honorable James M. Rosenbaum, commented in reference to a professional objector that "the remoras are on the loose again." *In re UnitedHealth Group PSLRA Litig.*, 643 F.Supp.2d 1107, 1108 (D. Minn. 2009). Professors Miller and Singer have summarized the typical conduct of professional objectors as follows:

> Class action practice in the United States has developed its own cohort of professional objectors: attorneys who enter a case after a settlement is announced, manage not only to object to the settlement but to intervene as counsel on behalf of a class member, and then threaten to disrupt the settlement unless they are given a hefty reward. The threat is not an idle one. As long as they can intervene, they can appeal the settlement as of right, and during the appeal process, the settlement will be in limbo. Class counsel will not be paid and class members will not receive their benefits. The prospect of delaying a settlement for months or years by taking an appeal is the realistic threat that objectors hold over the heads of the settling parties. . . .

Geoffrey P. Miller & Lori S. Singer, *Nonpecuniary Class Action Settlements*, 60 Law & Contemp. Probs. 97, 126 n.64 (Autumn 1997). And as the authors of a leading treatise on class actions have observed, objections lacking merit hurt the class. *See* Alba Conte & Herbert B. Newberg, 5 Newberg On Class Actions § 15.37 (4th Ed. 2002) ("meritless objections tend to delay providing benefits to bona fide and deserving class members inasmuch as settlements commonly do not provide for payment of any benefits until the judgment entered approving a settlement is final and not subject to further appeal"); *see also Devlin v. Scardaletti*, 536 U.S. 1, 23 n.5 (2001) (Scalia, J., dissenting) (observing that professional objectors' penchant for filing "canned" briefs and baseless objections often lead to baseless appeals in the quest for a fee).

1

2   Based on these authorities and Palmer's track record, Class Counsel respectfully requests

that the Court carefully consider the true motives behind the Balla Objection.[10]   After doing so,

3   Class Counsel believes it will be clear to the Court that the Balla Objection lacks merit and is

4   merely the latest attempt by Balla's counsel to leverage an objection into a settlement payment that

5   will have no benefit whatsoever to the class.

6
### III.  CONCLUSION

7   For each of the foregoing reasons, as well as the reasons set forth in the Motion  for Award of

8   Attorneys' Fees (Doc. 211) and the Motion for Final Approval (Doc. 213), the Balla and Graeser

9   Objections should each be denied in their entirety.

10
Dated:  March 7, 2011.
11

12                                             Respectfully submitted,

13                                             By: /s/ Keith R. Verges

14                                                     Keith R. Verges

15                                             Keith R. Verges
                                               Paarker D. Young
16                                             Raymond E. Walker
                                               FIGARI & DAVENPORT, L.L.P.
17                                             3400 Bank of America Plaza
                                               901 Main Street
18                                             Dallas, Texas 75202
                                               Telephone: (214) 939-2017
19                                             Facsimile: (214) 939-2090
                                               *ADMITTED PRO HAC VICE*
20
                                               Shawn T. Leuthold
21                                             Law Office of Shawn T. Leuthold
                                               1671 The Alameda #303
22                                             San Jose, California  95126
                                               Telephone: (408) 924-0132
23                                             Facsimile: (408) 924-0134

24
                                             **ATTORNEYS FOR PLAINTIFFS**
25

26
---
27   [10] Of course, if Palmer employs his usual strategy and attempts to appeal this Court's final ruling to the Ninth Circuit, Class Counsel reserve the right to move for the imposition of appropriate Appeal and/or Supersedeas Bonds.  In that

28   regard, Palmer has previously advocated that a $40,000 appeal bond is appropriate for anyone appealing from approval of a class settlement and at least this amount seems appropriate, if not more.  *See* Exhibit E at 2.

---
**RESPONSE TO OBJECTIONS TO PROPOSED SETTLEMENT**                                             **PAGE 16**
**CASE NO. C 09-01733-JW (PVT)**

1

2

## **CERTIFICATE OF SERVICE**

3

        I hereby certify that all counsel of record will be served with a copy of this document via

4

the Court's CM/ECF system pursuant to the local rules of this Court, on this 7th day of March,

5

2011.

6

                                        /s/ Keith R. Verges
                                        Keith R. Verges

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28